## WORTHINGTON, BELLOWS & CO. v. WHITMAN.

*Negotiable instruments—Defense—Consideration a gambling transaction—Stock margins—Section 5966, General Code (108 O. L., pt. 1, 218)—Proviso—Broker of stock exchange—Evidence of intent to gamble.*

In an action by the payee against the maker of a promissory note given in payment of stock purchased by defendant, the defense being that the note was given as consideration for money lost at gambling in the purchase and sale of stocks on margin, it is error for the trial court at the close of all the evidence to refuse to sustain a motion for a judgment for the plaintiff, where it clearly appears that the dealings between the parties come within the proviso of Section 5966, General Code, excluding certain transactions from the operation of Sections 5966 and 5969, General Code, and where there is an utter lack of evidence of mutuality of intent between the parties to conduct a gaming transaction, or evidence that the plaintiff had knowledge of any such intent on the part of the defendant.

(Decided November 25, 1921.)

ERROR: Court of Appeals for Cuyahoga county.

*Messrs. Wilkin, Cross & Daoust,* for plaintiff in error.

*Mr. John A. Elden,* for defendant in error.

SULLIVAN, J.   The plaintiff below, plaintiff in error here, brought suit in the municipal court of Cleveland against the defendant upon a promissory note, dated September 5, 1919, for $1,646.86, with interest at 6% payable on demand.

The defendant, in answer to the statement of claim, set up by way of defense that the note was obtained by duress, and that the sole consideration

therefor was money lost by the defendant in gambling, to-wit: the purchase and sale of certain listed stocks on what is known as a "margin," without the intent of either party to make actual delivery of the stocks at any time. And by way of counterclaim the defendant set up a claim for $400, alleging that the same was won from him by plaintiff, by gambling, to-wit, by purporting to buy and sell certain listed stocks without the intent of either party to make actual delivery of the same, and that said money was lost as a result of gambling, as aforesaid, in said stocks.

To this answer and counterclaim plaintiff replied, denying the allegations of the answer and counterclaim, and alleging that it was a limited partnership, duly licensed by the securities commission of Ohio; that it was a member of the New York Stock Exchange and the Cleveland Stock Exchange, and that it bought and sold stock on said exchanges.

The reply further stated that the transactions involved were actually executed by the plaintiff, that the sole and entire interest of plaintiff therein was that of broker, and that the securities ordered by defendant were received in accordance with the rules and regulations of the New York Stock Exchange.

The reply further alleged that defendant knew that plaintiff had bought and sold the stocks involved, on the New York Stock Exchange, in accordance with the rules and regulations of the exchange, and that defendant, at the time he ordered the purchase of the securities involved, did not disclose any intention on his part to gamble, and did not indicate the same in any way to plaintiff and that the same was not known; and the reply further alleged that said intention, if any existed, was not cognizant to said plaintiff.

At the close of the testimony, the plaintiff renewed a motion for judgment in its behalf, which motion was overruled by the court, to which the plaintiff duly excepted.

In 108 Ohio Laws, part 1, page 218, appears the following:

"An Act

"To amend Section 5966 of the General Code, relating to actions at law in betting.

"Be it enacted by the General Assembly of the State of Ohio:

"Section 1. That Section 5966 of the General Code be amended to read as follows:

"Sec. 5966. If a person, by playing a game, or by a bet or wager, loses to another money or other thing of value, and pays or delivers it or a part thereof, to the winner thereof, such person so losing and paying or delivering, within six months after such loss and payment or delivery, may sue for and recover such money or thing of value or part thereof, from the winner thereof, with costs of suit.

"Provided, however, that neither this Section, nor Section 5969 of the General Code, shall apply to any business transacted upon a regularly established stock exchange or board of trade through a member thereof whose relation to the transaction is that of broker only, and who actually delivers or receives the securities or other commodity bought or sold in accordance with the rules and regulations of said stock exchange or board of trade.

"Section 2. That said original section 5966 of the General Code be, and the same is hereby repealed.

"Carl R. Kimball,
"*Speaker of the House of Representatives.*
"Clarence J. Brown,
"*President of the Senate.*
"Passed April 16, 1919.
"Approved May 10, 1919.
"James M. Cox,
"*Governor.*
"Filed in the office of the Secretary of State at Columbus, Ohio, on the 12th day of May, A. D. 1919."

It is to be observed that above law was approved May 10, 1919, and filed in the office of the secretary of state on the 12th day of May, 1919, but under the provisions of Section 1c, Article II of the Ohio Constitution, as amended, said law did not go into effect until ninety days after the date of said approval, which date of effect was August 10, 1919. The note sued upon bears date of September 5, 1919, subsequent to the expiration of the aforesaid ninety days provided for in the constitution.

The amount of consideration named in the note was $1,646.86, and from the evidence was intended to state the condition of the account of the defendant with the plaintiff, in accordance with the books of said plaintiff. In other words, the defendant was owing the plaintiff for money the plaintiff advanced on purchases for stocks at the instance of the defendant in the sum of $1,646.86.

At the close of the evidence, when plaintiff renewed its motion for judgment in its favor, it clearly and without denial appeared that said promissory note was duly executed by defendant; that the plaintiff was a member of a regularly established stock

exchange; that the plaintiff's relation to the transactions involved was that of a broker only; that plaintiff actually delivered or received the securities or stocks bought or sold in accordance with the rules and regulations of the stock exchange. And these facts are shown by an examination of the record on pages 3, 4, 5, 6 and 7, and other pages, but especially on pages 42 and 43, where the court itself propounded certain significant interrogatories, to-wit:

"Q. For my own enlightenment, Mr. Bellows, where stocks and securities are not received, or delivered at the stock exchange, does Cleveland and New York have rules and regulations governing these transactions?

"A. Every order we buy that we execute by ourselves, either Worthington, Bellows & Co. or agents receive or deliver the securities except in cases which go to the clearing house of the New York Stock Exchange.

"Q. Have you rules and regulations?

"A. Yes.

"Q. Were these sold under those rules and regulations?

"A. Every order we buy or execute was sold under the rules and regulations of the New York Stock Exchange.

"Q. That is all."

From this evidence, it clearly appears, with respect to the transactions between the parties to this cause, that they came under the proviso of the amendment to Section 5966, General Code, which excluded from the operation of Sections 5966 and 5969, General Code, "any business transacted upon a regularly established stock exchange or board of trade

through a member thereof whose relation to the transaction is that of broker only, and who actually delivers or receives the securities or other commodity bought or sold in accordance with the rules and regulations of said stock exchange or board of trade.''

The nature of the transactions involved herein, which culminated in the promissory note of September 5, 1919, squarely responded to the proviso in the amendment aforesaid, and there being an utter lack of any evidence in the case at the time of the renewal of the motion aforesaid, of mutuality of intent between the parties hereto to conduct a gaming transaction, and there being an absolute absence of any evidence that the plaintiff had any such intention, or had any knowledge that the defendant himself had any such intention on his own part, it would seem that under such a state of the testimony there was only one thing for the court to do, and that was to sustain the motion made by the plaintiff at the close of the testimony for a judgment in its favor, especially when it appeared by substantial proof that the plaintiff either actually delivered or received the securities, or was in a position actually to receive and deliver the securities involved, in accordance with the rules and regulations of the stock exchange.

Upon the question as to whether the plaintiff was willing and capable of receiving and delivering the securities involved, there was no denial on the part of counsel for defendant, but, on the contrary, counsel for defendant openly admitted in argument that the plaintiff could have delivered the securities had the same been required, and as the proof bears out this admission, it seems to the court that the same

is equivalent, so far as the legality of the transaction is concerned, to actual physical delivery.

It therefore follows that error of law was committed by the court below in refusing to grant the motion to direct a verdict for the plaintiff, and in refusing to grant the motion for new trial, and this court so holds.

Reasoning by analogy, the verdict and judgment in favor of the defendant were manifestly against the weight of the evidence, and, therefore, contrary to law.

It was incumbent upon the defendant to establish by a preponderance of the evidence, in order to sustain his claim, that the plaintiff was not a regularly established stock exchange or board of trade; that the plaintiff was not a broker, and was not a member of a regularly established stock exchange through which the transactions were consummated; that the broker profited beyond the commissions; and that the securities or stocks were not actually bought and sold, received and delivered, in accordance with the rules of the stock exchange or board of trade. There was no substantial evidence of this negative character.

On page 5 of the record, the following appears:

"Q. The stocks which you buy are always paid for in full when you buy them? A. Yes—you mean we pay for them?

"Q. Yes. A. Yes.

"Q. Worthington, Bellows & Co. pay for them in full when they buy them, and do the customers pay you in full for the stocks? A. Sometimes he does, and sometimes part of the price, and we advance the balance."

And on page 6 this appears:

"Q. They buy the stock? A. They buy it up absolutely."

Again, on page 7:

"Q. Do you ever make any attempt to deliver the stock certificate and take this stock out and sell it? A. Yes.

"Q. Did you do that with Mr. Whitman? A. Yes."

Again, speaking of the purchase and sale of General Motors, on pages 8 and 9:

"Q. How many shares did he buy? A. He bought ten shares at that time.

"Q. He bought ten shares for $200? A. Yes.

"Q. In other words you say, that company bought ten shares of General Motors? A. We acted as Whitman's agents in buying the stock for him.

"Q. You just testified you bought the stock outright for Whitman? A. Yes.

"Q. And you bought ten shares of stock for 175 and something, for which you took 200 from Whitman? A. That is correct.

"Q. What other stock did Mr. Whitman buy according to your statement? A. He bought ten shares of Royal Dutch or New York Dutch."

Again, on page 12:

"Q. What else did he buy? A. He bought ten shares of May Company stock.

"Q. That was on the Cleveland Stock Exchange? A. On the New York Stock Exchange."

Again, on page 14:

"Q. This note, marked 'Plaintiff's Exhibit A' was given in payment for money which you claimed defendant owed you in connection with these stock

transactions with you, Mr. Bellows? A. That is the fact.

"BY THE COURT: Money advanced by you for buying securities? A. Yes."

Now, then, as to the initial transaction, which tends to establish the relationship between the plaintiff and the defendant in these stock transactions, page 17:

"Q. What stocks did he say he would get for you, when you first went in there? A. He started me on General Motors, and he said: 'Get in on General Motors, I think I can make you money.'

"Q. Did you get any? A. I did.

"Q. How many shares did you buy? A. 10.

"Q. How much money did you pay? A. $200.

"Q. Can you recall offhand how many of their shares of stock you bought altogether, in your transactions? A. All the way through?

"Q. Yes. A. I can't say exactly.

"Q. You heard Mr. Bellows' testimony—was that correct as far as you remember? A. It was."

Again, on page 20:

"Q. Did you ever get any stock certificates evidencing any of this stock that they claim you purchased? A. Yes, the Cleveland Automobile are the only ones, 2 shares.

"Q. You got a stock certificate covering them? A. Yes."

From the character of this evidence, which pervades the record, it is apparent that the record is absolutely silent as to any intention on the part of the plaintiff to engage in gambling transactions with the defendant, and there is an utter failure of proof throughout the entire record to show that the provisions of Section 5966, General Code, as amended, did not apply to the transactions.

With the view of the court herein expressed as to the absence of material evidence with respect to the illegality of the transactions involved, it is also apparent that the trial court erred prejudicially in its charge to the jury, when it said:

"In substance he [the customer] claims the plaintiff company ran what is known in the law commonly as a 'bucket shop,' and that he gambled there on margins. If you find that to be true, and that both parties had a common intention, there must be but the one verdict, against plaintiff on its statement of claim and for the defendant, for $400 which he claims he expended in that fashion as stated in his counter-claim."

We therefore hold that the verdict and judgment of the court below in favor of the defendant were manifestly and clearly against the weight of the evidence, and contrary to law, as above set forth, and the court having erred in refusing to grant the motion to direct a verdict for the plaintiff and to sustain the motion for a new trial the judgment below is hereby reversed and judgment rendered in favor of the plaintiff in error for the amount claimed on the promissory note sued upon in the statement of claim, with interest.

*Judgment reversed and judgment for plaintiff in error.*

VICKERY, P. J., and INGERSOLL, J., concur.